629 A.2d 154

**COMMONWEALTH of Pennsylvania,**

v.

**Robert L. HOLBROOK, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 5, 1993.

Filed Aug. 9, 1993.

390

Malcolm W. Berkowitz, Philadelphia, for appellant.

Norman Gross, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before CIRILLO, BECK and KELLY, JJ.

CIRILLO, Judge:

This is an appeal from a judgment of sentence entered in the Court of Common Pleas of Philadelphia County. We affirm.

Appellant Robert L. Holbrook was arrested and charged with the murder of Elsie Olmeda and numerous other offenses in connection with her death. Holbrook waived trial and entered a plea of guilty to murder and conspiracy generally and a degree-of-guilt hearing was scheduled. Following the degree-of-guilt hearing, Holbrook was found guilty of first-degree murder, criminal conspiracy, robbery, burglary, and possessing an instrument of crime, generally. Holbrook received a sentence of life imprisonment on the murder conviction, concurrent terms of five to ten years for the conspiracy conviction, and ten to twenty years on the robbery conviction. The remaining sentences for the burglary and possession convictions were suspended. Holbrook now brings this direct appeal. We are asked to consider the following issues:

1. Did the trial court err in finding Holbrook guilty of first-degree murder at the degree-of-guilt hearing?

2. Did the trial court err in denying Holbrook's motion to withdraw his guilty plea and/or further err in denying Holbrook's motion for a new degree-of-guilt hearing based upon his trial counsel's ineffectiveness?

A review of the record reveals that the evidence presented before the trial court was sufficient to sustain a finding of murder in the first degree. The test to be conducted in response to a claim that the evidence was insufficient to convict is well established:

The test for the sufficiency of the evidence in a criminal case is whether the evidence is sufficient to prove every

element of the crime beyond a reasonable doubt. In making this determination, the reviewing court must view the evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict.

*Commonwealth v. Hughes,* 521 Pa. 423, 430, 555 A.2d 1264, 1267 (1989) (citations omitted). The *mens rea* required for first-degree murder is specific intent to kill. *Commonwealth v. Cain,* 349 Pa.Super. 500, 503 A.2d 959 (1986). The specific intent to kill may be established solely from circumstantial evidence. *Commonwealth v. Jones,* 391 Pa.Super. 292, 570 A.2d 1338 (1990), *alloc. denied,* 528 Pa. 608, 596 A.2d 155 (1991). A conviction for conspiracy to commit a crime may be inferred from circumstances surrounding the alleged conspiratorial activity, and from the relationship, conduct and overt acts of the parties. *Commonwealth v. Anderson,* 381 Pa.Super. 1, 552 A.2d 1064 (1988), *alloc. denied,* 524 Pa. 616, 571 A.2d 379 (1989).

▮ Viewing all the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, the record establishes the following: Holbrook, 16 years old at the time the incident occurred, had been selling drugs for co-conspirator George Padilla for about three months. Holbrook feared Padilla and was aware of Padilla's reputation as a "hitman." On the night of Ms. Olmeda's murder, Holbrook met up with the other co-conspirators outside of Padilla's home. Padilla was a relative of Olmeda's. They agreed that they would rob Ms. Olmeda as her husband was incarcerated and she would be home alone with her children. The defendants drove together to Olmeda's home and forced their way into the residence by pushing Olmeda onto the floor. Once inside, the co-conspirators dragged Olmeda up her hall stairs to the second floor. The co-conspirators immediately began to beat Olmeda and demanded that she give them money. While the co-conspirators were beating Olmeda on the second floor, Holbrook was told to stay downstairs and guard Olmeda's sleeping child on the couch.

Olmeda's other child was locked in a closet. After finding the money, the co-conspirators set out to kill Olmeda to prevent her from identifying her perpetrators. The co-conspirators tried strangling and stabbing Olmeda. One of the co-conspirators came down to the first floor and got a knife from the kitchen. Later, Holbrook went to the kitchen and retrieved an extension cord and threw it up to the co-conspirators on the second floor. This cord was one of the objects used to kill Olmeda. The co-conspirators hogtied Olmeda's hands and feet, tied her to the banister and then repeatedly strangled and stabbed her. During this murderous episode, Holbrook listened to the "noises" and maintained his position as guard over the child who awoke during the commotion.

Suddenly, all the noises stopped and the co-conspirators began to descend from the second floor. One co-conspirator had blood on his sleeve. Holbrook admits at that point he thought that Olmeda had been killed. Olmeda was found with a telephone cord wrapped around her neck, multiple stab wounds and the knife lodged in her throat. She was unable to be resuscitated and died on the way to the hospital. An autopsy revealed that she had died from strangulation and multiple stab wounds.

While Holbrook's actions were significantly less horrendous than those of his cohorts, he nonetheless participated in the murder and his conduct rose to the level of first-degree murder. Holbrook admits that he knew they were going to Olmeda's home to rob her and he participated in gaining entry into Olmeda's house. He further aided in the conspiracy by watching over Olmeda's sleeping child on the first floor couch. As this conspiracy took a dreadful turn to include the murder of Olmeda, Holbrook continued his duty as watchman, and retrieved an extension cord for use by his cohorts during which time Olmeda was being excruciatingly beaten and was screaming out. Holbrook remained silent and took no action even after seeing Olmeda's blood on another co-conspirator's sleeve.

We find no significance in either the fact that Holbrook may have been ignorant/unaware of the intended use of the exten-

sion cord he supplied, or, that the reason for his cohort's trip to the kitchen was to obtain a knife. The attack on Olmeda was brutal and quite prolonged and occurred inside of a small, two story rowhouse. This house was only thirty feet, nine inches long, and fifteen feet, nine inches wide. The trial court was presented with testimony that other persons could easily be heard inside of the house. The trial court's determination, as factfinder, that Holbrook knew that the victim was being brutally murdered during the time that he maintained his duty as guard, and in obtaining one of his cohort's weapons of choice, is sufficiently established in the record. When coupled with the fact that Holbrook listened to Olmeda's prolonged screams and the contemporaneous commotion surrounding her death and his knowledge of Padilla's reputation as a hitman, the record evidences that the Commonwealth established that Holbrook willingly participated in the conspiracy to commit robbery and remained loyal to his cohorts when this conspiracy transformed into murder. Accordingly, we find Holbrook's first issue meritless and we affirm the trial court's finding that Holbrook harbored a specific intent to kill Ms. Olmeda.

Holbrook next contends that the trial court erred in denying his motion to withdraw his guilty plea. Holbrook alleges his decision to waive trial and plead guilty was not knowing and intelligent, and instead, that he was coerced by his attorney to plead after his attorney promised him a conviction of only third-degree murder. Holbrook also contends that as a result of his trial counsel's promise of a conviction of only third-degree murder he was wrongfully advised not to testify at the degree-of-guilt hearing. Intertwined in both allegations is Holbrook's contention that his trial counsel was ineffective.

■ Our standard of review when evaluating a claim of ineffective assistance of counsel is well-settled, presumes that counsel is effective, and places on the defendant the burden of proving otherwise. *Commonwealth v. Williams*, 524 Pa. 218, 230, 570 A.2d 75, 81 (1990); *Commonwealth v. Gonzalez*, 415 Pa.Super. 65, 71, 608 A.2d 528, 531 (1992). We are first required to determine whether the issue underlying the claim is of arguable merit. *Commonwealth v. Johnson*, 527 Pa. 118,

122, 588 A.2d 1303, 1305 (1991). If the claim is without merit, our inquiry ends because counsel will not be deemed ineffective for failing to pursue a meritless claim. *Id.* Even if the underlying claim has merit, the appellant still must establish that the course of action chosen by his counsel had no reasonable basis designed to effectuate the client's interest and that the ineffectiveness prejudiced his right to a fair trial. *Id; Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

An attempt to withdraw a plea of guilty after sentencing will only be granted where the defendant is able to show that his plea was the result of manifest injustice. Pa. R.Crim.P. 321; *Commonwealth v. Refile,* 353 Pa.Super. 190, 509 A.2d 400 (1986), *alloc. denied,* 518 Pa. 655, 544 A.2d 1342 (1988). To establish manifest injustice, Holbrook must show that his plea was involuntary or was given without knowledge of the charge. *Commonwealth v. Fenton,* 388 Pa.Super. 538, 566 A.2d 260 (1989). A review of the record establishes the following. In response to Holbrook's motion to withdraw his guilty plea, the trial court conducted a hearing during which time Holbrook's counsel testified in great detail his efforts on Holbrook's behalf. Trial counsel testified that anything discussed with Holbrook was first discussed with his family including decisions concerning a jury trial, the possibility of a guilty plea, and although there was no guarantee, the hope of a conviction of a lesser degree then first-degree murder. Further, before accepting Holbrook's guilty plea, the trial court engaged in a lengthy colloquy with Holbrook as is required to ascertain if Holbrook's plea was voluntarily and understandingly tendered. Pa.R.Crim.P. 319; *Commonwealth v. Braxton,* 410 Pa.Super. 391, 600 A.2d 198 (1991). A review of the colloquy establishes that Holbrook and his father fully understood that Holbrook could ultimately be found guilty of first-degree murder and receive a sentence of life imprisonment. The trial court found that trial counsel was thoroughly prepared for trial, that Holbrook and his family were advised of the progression of events, and that counsel was effective in representing Holbrook. This court is bound by the factual findings and credibility determinations made by the trial court. *Commonwealth v. May,* 485 Pa. 371, 402 A.2d

1008 (1979). Based on Holbrook's trial counsel's testimony, and the lengthy colloquy conducted by the trial court, the trial court found that Holbrook failed to show his plea was the result of manifest injustice. After reviewing the record, we conclude, as did the trial court, that Holbrook's plea was knowing and voluntary and that Holbrook has failed to establish that it resulted from manifest injustice. *Refile, supra.* As a result, Holbrook's claim for ineffectiveness must also fail. *Pierce, supra.*

 Additionally, Holbrook alleges that he was wrongfully advised by his trial counsel not to testify at the degree-of-guilt hearing. Holbrook contends that such testimony would provided substantial evidence likely to reduce his conviction to third-degree murder or voluntary manslaughter. As such, Holbrook contends that his trial counsel was ineffective and further, that a new degree-of-guilt hearing should be held. We disagree. Prior to Holbrook's arrest, he dictated a statement to his sister which detailed his version of the events that took place on the night of Olmeda's murder. Holbrook, along with his trial counsel, went and surrendered to the police. Holbrook gave the police a statement which was essentially the same as the statement dictated earlier to his sister. The substance of these two statements represented the only version of the events ever related to trial counsel. Holbrook's trial counsel testified during the hearing on Holbrook's motion to withdraw his plea that since Holbrook could not add to anything more than what was offered in the statements, that it was trial counsel's decision that it would not be prudent to subject Holbrook to cross-examination by the prosecutor. Holbrook never repudiated the contents of his statements and in fact had stated that he would not have added anything else. At the hearing, the trial court specifically questioned Holbrook as to those factors which determined Holbrook's level of guilt. Holbrook's claim that he be given a new degree-of-guilt hearing is meritless and as a result, Holbrook's claim of ineffective assistance also fails. *Pierce, supra.*

Judgment of sentence affirmed.

KELLY, J., files a concurring and dissenting Opinion.

KELLY, Judge, concurring and dissenting.

In my opinion, appellant committed no more than second degree murder. Hence, I dissent.[1]

The trial court summarized the evidence which it found credible. According to the trial court, appellant and cohorts planned to rob Elsie Olmeda, knowing that she would be home alone with her three children. Appellant and the others forced their way into the small house. The others dragged the victim upstairs, and bound her with a telephone wire. Meanwhile, Ms. Olmeda was resisting and yelling. Appellant was downstairs, ensuring that one of Ms. Olmeda's young children did not make his way upstairs to help his mother or escape to call for help. While appellant was downstairs, a cohort walked passed him to obtain a knife from the kitchen. Also, the men who were upstairs yelled down for appellant to supply them with more cord, which could be found in a kitchen drawer. In response, appellant threw them an extension cord. When appellant was leaving with the group, he noticed that one confederate's jacket was bloody.

The judge, as fact finder, concluded:

This brutal and prolonged attack against Ms. Olmeda occurred inside a small, two-story rowhouse, which was thirty feet, nine inches long, and fifteen feet, nine inches wide. (N.T. 3.78–3.81). There was testimony other persons were easily heard on other floors inside this two room per floor, airlite house. (N.T. [3.81] ). The deceased was tied, strangled, and repeatedly stabbed at the top of the second floor stairs while the defendant was on the first floor. Defendant was also aware of co-defendant George Padilla's reputation as a "hitman" (N.T. 4.29) at the time of this incident.

It was simply inconceivable to this Court, as factfinder, that defendant did not know that the victim was being brutally murdered during the time that he acted in concert with his

1. I agree with the majority that appellant knowingly and voluntarily pleaded guilty and that counsel was not ineffective.

co-felons by providing an instrument for her death, the extension cord, and by guarding over her children.

Trial Court Opinion at 9.

No evidence established that the electric extension cord which appellant threw upstairs was used to strangle Ms. Olmeda. To the contrary, the extension cord was found wrapped around Ms. Olmeda's torso and tied to the railing, while a telephone cord, which was ripped from an upstairs telephone, was found wrung around the victim's throat. *See* N.T. February 27, 1991 at 3.53 (testimony of Officer Gage); *id.* at 3.58 (testimony of Officer Harmer). Moreover, there was no evidence to the effect that appellant was aware that a co-conspirator went to the kitchen for the purpose of obtaining a knife and that appellant saw a co-conspirator return upstairs with a knife. Even if the trial court could have inferred that a cohort passed by appellant to get the knife and ᵥbrought it upstairs, the Commonwealth elicited no evidence that appellant was aware that the cohort who passed by was carrying a knife. Furthermore, that appellant noticed blood on Anthony Moss' jacket when all of the co-defendants were leaving cannot establish an earlier intent to kill.[2]

Viewing the evidence in the light most favorable to the Commonwealth, the Commonwealth proved that appellant and co-conspirators forcibly entered Ms. Olmeda's house. Appellant was shown to have realized that they were to rob her. Therefore, he was certainly part of a conspiracy to commit robbery.

Next, appellant agreed to watch the victim's oldest child, who was sleeping on the couch on the first floor. While he was watching the child, there was noise—banging and yelling—from the co-defendants and victim, who were upstairs. Appellant heard the noise. There was no indication that

2. *See Commonwealth v. Berkowitz*, 415 Pa.Super. 505, 523–24 n. 6, 609 A.2d 1338, 1347 n. 6 (1992), *petition for allocatur granted*, 531 Pa. 650, 613 A.2d 556 (1992) (evidence after completion of act not relevant to intent to commit act).

appellant saw what transpired on the second floor.[3] Appellant noticed a cohort pass by, go into the kitchen, and return upstairs. Appellant was directed to toss up an extension cord which could be found in the kitchen drawer. Appellant went into the kitchen, saw an extension cord hanging out of a kitchen drawer, and walked to the bottom of the stairs, where he threw the cord to a co-defendant who was waiting on the stairs. Appellant continued to watch the child on the couch. When the group returned downstairs, and they all left, appellant noticed blood on Tony Moss' sleeve.

The above evidence falls short of establishing that appellant harbored a specific intent to kill Elsie Olmeda. Before appellant and his co-defendants entered Ms. Olmeda's house, no one evinced an intent to kill her. Therefore, any intent must have arisen while the robbers were inside the house.

There was no evidence showing that appellant *knew* that the extension cord would be used to strangle Ms. Olmeda. The fact that he supplied an extension cord to his co-defendants, who were upstairs with a victim who was yelling, did not establish that appellant willed the co-defendants to use the cord to wrap around the robbery victim's neck. The object of appellant's actions was to participate in a conspiracy to rob. He did not partake in a second conspiracy whose object was to kill, although the co-defendants upstairs did. The act of supplying the extension cord furthered the robbery by providing a means to restrain the victim and by facilitating access to the cache of money, but that act was not sufficient to establish appellant's specific intent to kill. Appellant also watched a child during the robbery. The mere fact that there was noise upstairs did not render appellant knowledgeable of a scheme to murder. Therefore, his standing post downstairs indicated

3. Elsie Olmeda was found bound to a railing located between the bathroom and the children's room. *See* N.T. February 26, 1991 at 2.68. While there was evidence that the bathroom could be seen from downstairs, there was no evidence that the *hallway*, where Ms. Olmeda was found, could be seen from downstairs. Indeed, by accepting the substance of appellant's statement, the court found that appellant remained downstairs, watching the child on the sofa. *See* Trial Court Opinion at 8.

only his complicity in a robbery conspiracy. After a review of the evidence, therefore, I conclude and would hold that the Commonwealth adduced insufficient evidence to prove appellant guilty of first degree murder.[4]

For the foregoing reasons, I concur in part and dissent in part.

---

4. Appellant pleaded guilty to murder generally. During trial, he was shown to have participated in a robbery. Therefore, appellant is guilty of second degree murder. *See* 18 Pa.C.S.A. § 2502(b), (d) (felony murder). Because there is no triable issue as to whether appellant is guilty of second degree murder, I would remand to the trial court with directions to enter judgment of sentence in accordance with a conviction of second degree murder.